**RECEIVED**
IN ALEXANDRIA, LA.

MAY − 6 2014

TONY R. MOORE, CLERK
BY
    DEPUTY

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

NIKKI LEE MOSES,                CIVIL ACTION
        Appellant              NO. 1:13-CV-0550

VERSUS

U.S. COMMISSIONER OF THE        JUDGE DEE D. DRELL
SOCIAL SECURITY ADMINISTRATION,  MAGISTRATE JUDGE JAMES D. KIRK
        Appellees

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Nikki Lee Moses ("Moses") filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on July 21, 2011, when she was 31 years old, alleging a disability onset date of June 20, 2011 in her DIB application and a disability onset date of August 4, 2007 in her SSI application (Tr. pp. 116, 120) due to "right knee problems, anxiety, back problems" (Tr. p. 152).[1]  Those applications were denied by the Social Security Administration ("SSA") (Tr. p. 79).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on May 23, 2012 at which Moses appeared with her attorney and a vocational expert ("VE") (Tr. p. 27).  The ALJ found that, although Moses suffers from severe impairments of depressive disorder, anxiety disorder and degenerative changes to the lumbar spine with right-sided radiculopathy (Tr. p. 15), she has the

_____

[1] In her disability report, Moses stated that she stopped working on September 10, 2009 because the company she was working for was bankrupt, but that her conditions became severe enough to prevent her from working on June 20, 2011 (Tr. p. 152).

residual functional capacity to perform light work except that she is limited to no more than occasional climbing of stairs and ramps, and occasional stooping, kneeling, crouching or crawling, only unskilled work involving few, if any, changes to the work process and no quotas or time limits (such as assembly work or piecework), no interaction with the general public, no more than occasional interaction with co-workers and supervisors, and she should work alone and not as part of a team or collaborative effort (Tr. p. 17).  The ALJ concluded that Moses can do some work that exists in significant numbers in the national economy such as sorter, cleaner/polisher, and flagger (Tr. p. 21), so she was not under a disability as defined by the Social Security Act at any time from June 20, 2011 through the date of the ALJ's decision on August 24, 2012 (Tr. pp. 21-22).

Moses requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Moses next filed this appeal for judicial review of the Commissioner's final decision.  Moses raises the following issues for review on appeal (Doc. 10):

> 1. The ALJ declined to adopt the mental restrictions assessed by Dr. Wood and she adopted a mental RFC which is not reflective of the assessment by Dr. Thrasher, the source on whom she intended to rely.  No evidentiary choices support the ALJ's finding, and the mental RFC adopted by the ALJ is less restrictive than any mental assessment in the record.

> 2. The ALJ found that the claimant cannot resume past work, and the burden to prove other jobs shifted to the

agency.   Since the assumptions which underpin the VE's
testimony are unsupported, the Commissioner's burden to
prove other jobs is unsatisfied.

The Commissioner filed a brief in response to Moses' appeal (Doc.
11).   Moses' appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an
application and be an "eligible individual" as defined in the Act.
42 U.S.C. 1381(a).   Eligibility is dependent upon disability,
income, and other financial resources.   42 U.S.C. 1382(a).   To
establish disability, plaintiff must demonstrate a medically
determinable physical or mental impairment that can be expected to
last for a continuous period of not less than 12 months.   Plaintiff
must also show that the impairment precludes performance of the
work previously done, or any other kind of substantial gainful
employment that exists in the national economy.   42 U.S.C.
1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must
meet certain insured status requirements, be under age 65, file an
application for such benefits, and be under a disability as defined
by the Social Security Act.   42 U.S.C. 416(I), 423.   Establishment
of a disability is contingent upon two findings.   First, a
plaintiff must suffer from a medically determinable physical or
mental impairment that can be expected to result in death or that
has lasted or can be expected to last for a continuous period of
not less than 12 months.   42 U.S.C. 423 (d)(1)(A).   Second, the
impairments must render the plaintiff unable to engage in the work

3

previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

At her May 2012 administrative hearing, Moses was 32 years old (Tr. pp. 27, 170).   In her July 2011 disability report, Moses stated that she was 5'11" tall, and weighed 200 pounds (Tr. p. 152).   Moses earned a GED in 1997, and has past relevant work as a secretary (1997-2005, 2008-2009), a construction laborer (2006-2007), and a catering assistant (2006-2010) (Tr. p. 153).

1. Medical Records

Moses was in a moving vehicle accident in 2007 (Tr. p. 360). An MRI of Moses' lumbar spine in November 2007 showed a left paracentral L4-5 protrusion or mild extrusion which could cause left L5 radiculopathy (Tr. pp. 318-319).

In August 2009, Moses went to the emergency room for two panic attacks in one day, characterized by headache and hyperventilation; Moses was diagnosed with anxiety and prescribed Xanax (Tr. pp. 219-231).   It was noted that Moses smokes one pack of cigarettes per day (Tr. p. 224).

On July 6, 2011, Moses was treated at the Avoyelles Hospital emergency room for right knee pain which had started fourteen days before and worsened; Moses stated that she had felt a "pop" in her knee (Tr. p. 235).   Moses' right knee was swollen, walking was painful, and she had a limited range of motion in her right knee and ankle (Tr. pp. 235-236).   Moses was diagnosed with a right knee strain and prescribed Voltaren (Tr. pp. 236-239).

4

On July 7, 2011, Moses was evaluated at the LSU Health Sciences Center for her severe right knee pain (Tr. p. 251) and diagnosed with a knee ligament injury (Tr. pp. 253, 328).  Moses was prescribed Percocet, Naprosyn, and Lortab, and an MRI was scheduled (Tr. p. 252, 329).

On July 21, 2011, the swelling in Moses' knee had resolved. X-rays of Moses' knee were normal (Tr. pp. 245, 256, 335), and an MRI was also normal (Tr. pp. 257, 337).

On August 11, 2011, Moses was prescribed a Medrol dose pak for continued right knee pain as well as low back pain (Tr. pp. 280, 339).

On August 24, 2011, Moses had an MRI of her lumbar spine which showed minimal broad-based protrusion with an associated central annular tear at L4-5 and evidence of early degenerative disc disease at L4-5 (Tr. pp. 270, 315, 340).

On August 26, 2011, Moses went to the emergency room for complaints of back pain (Tr. pp. 284, 345).  Moses was found to have pain in the quadriceps on right knee flexion and pain in the right hip area with hip flexion, but good motion (Tr. pp. 285, 344).  Right leg raises were 50 to 60 degrees and left leg raises were up to 70 degrees, she had no back pain with hip rocking but there were muscle spasms on the quadriceps, and there was right ankle pain on flexion but there was no swelling or calf tenderness (Tr. pp. 285, 344).  Moses was diagnosed with muscle spasm and sprain/strain in the lumbar region (Tr. pp. 286, 343), was given a Toradol injection and was prescribed Cyclobenzaprine and Naproxen

5

(Tr. pp. 285-287, 344).

On August 27, 2011, Moses had a mental statue examination with Fay Thrasher, Ph.D., a clinical psychologist (Tr. p. 273). Moses reported no history of psychiatric treatment, but admitted she had gone to drug rehabilitation for a crystal meth addiction and had been clean since 2006 (Tr. p. 273). Dr. Thrasher diagnosed depressive disorder NOS, anxiety disorder NOS, and amphetamine dependence (by history) at Axis I, severe psychosocial stressors of unemployment, interpersonal problems, history of substance abuse, and physical problems at Axis IV, and a GAF of 60 at Axis V (Tr. p. 275).[2] Dr. Thrasher stated that Moses' understanding was fair, her judgment and insight were poor, her remote memory was poor, her

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. DSM-IV-TR at 25-30. GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at 32-34. The GAF scale goes from 0-100. A GAF of 61-70 represents some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, and has some meaningful interpersonal relationships. A GAF of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34. Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

immediate recall and delayed recall were fairly good, her concentration and persistence were fair, her social interaction was impaired (easily agitated and isolates herself, which could cause difficulties in competitive employment), and her adaption appeared poor at that time (Tr. p. 275).

A nursing flow sheet showed that, in September 2011 Moses' blood pressure was 150/95 and she weighed 217 pounds, in January 2012 Moses' blood pressure was 144/92 and she weighed 220 pounds, and in March 2012, her blood pressure was 139/90 and she weighed 222 pounds (Tr. p. 298).

Also in September 2011, Moses was evaluated at the Office of Mental Health and Substance Abuse (Tr. pp. 304-305).  Moses complained of depression, agitation, irritability, not leaving her house, and chronic back pain, said that she had not had any panic attacks since February, her past prescriptions had been for Cymbalta, Zoloft, and Xanax, admitted her past history of alcohol abuse and crystal meth abuse (2003-2006) (Tr. p. 304).  Moses also reported that she did not want to be around people, did not want to eat, and had trouble sleeping (Tr. p. 306).  Moses reported that she had not taken medications since 2009 (Tr. p. 306).  Moses' affect was blunted, she was oriented, her memory and recall were good, and her thinking was logical (Tr. p. 305).  Moses was found to have symptoms of depression and anxiety, a history of substance abuse but clean for five years, no family support, did not get along with her family, no income, had not worked since 2009, and her insight, impulse control and judgment were good (Tr. p. 311).

The diagnoses were dysthymic disorder without psychotic features and anxiety disorder NOS, and management through medications and individual counseling was recommended (Tr. p. 312).

In October 2011, Moses had a depressed mood, low energy, poor sleep, social isolation, chronic tension and worry, and occasional severe panic episodes (Tr. p. 300).  Moses found to have a GAF of 70, and was told to attend her Office of  Mental Health appointments and learn relaxation breathing techniques (Tr. p. 300).

In November 2011, Moses began physical therapy (Tr. pp. 348-357).  After the first treatment, Moses reported soreness but the therapy helped, she was compliant with her exercises, and she ambulated more fluidly; Moses received manual therapy which corrected her pelvic asymmetry and lower back therapy which resulted in a significant reduction in pain and symptoms (Tr. p. 351).  Continued physical therapy reduced Moses' pain and symptoms (Tr. p. 353), but Moses stopped going after December 8, 2011 (Tr. p. 357).

Also in November 2011, Dr. Guillot noted Moses' complaints that her pelvis was out of line and she has a disc protrusion in her back, her blood pressure was 138/86, her weight was 223 pounds, and she had right-sided lumbar pain with radiation into her right leg, but a negative straight leg raise (Tr. p. 322).  Dr. Guillot diagnosed low back pain and prescribed Xanaflex, Meloxicam, and Tramadol (Tr. p. 322).  In December 2011, Dr. Guillot noted that a muscle relaxer had helped with Moses' calf pain, and decreased the

Xanaflex, continued the Meloxicam, and increased the Tramadol (Tr. pp. 294, 323).

In February 2012, Moses was examined by Dr. David Guillot for back pain and reported that she was hurting really badly with radiation of pain from her back into her lower extremity, with a burning sensation in her back (Tr. p. 293). Dr. Guillot diagnosed low back pain and depression with anxiety, increased her Tramadol dosage, and prescribed Gabapentin (Tr. p. 293)

In March 2012, Moses was again diagnosed at the Office of Mental Health with dysthymic disorder, (past) alcohol and amphetamine abuse, past moving vehicle accident, back injury, and obesity; her previous medications were discontinued and she was prescribed Buspar, Wellbutrin, and Vistaril (Tr. p. 299). It was noted that Moses had been taking her medications and wanted to stay on them, her eating and sleeping were good, she reported that she did not need Trazadone for sleep at that time, she was calm and cooperative, her thinking was linear and goal-directed, she was oriented, her mood was good, and she denied having any depressive symptoms (Tr. p. 303).

In May 2012, Moses blood pressure was 110/80 and her weight was 230 pounds (Tr. p. 360). She complained of low back pain that was not improving and depression with anxiety (Tr. p. 360). Moses' Tramadol was increased, and she was prescribed Gabapentin and Xanaflex (Tr. p. 360).

### 2. May 2012 Administrative Hearing

At the May 23, 2012 administrative hearing, Moses testified

that she lives in Alexandria with her two daughters, ages 8 and 13 (Tr. p. 33).  Moses testified that she has a GED, does not have any post-secondary education, and does not have any income; Moses received unemployment benefits until 2011 (Tr. p. 34).  Moses testified that she had applied for jobs and attempted to work for one day at a restaurant, but had been unable to do the work (Tr. p. 35).

Moses testified that her back pain is constant, a soreness that can increase to stabbing and burning (Tr. p. 36).  Moses testified that her right leg pain is also constant and worsens when she stands too long (Tr. p. 36).  Moses testified that standing too long causes the pain to go from her leg into her back, sitting too long also increases the pain, and laying down in certain positions can be painful (Tr. p. 36).  Moses testified that she can stand for ten minutes before she has to sit, and she can sit for five to ten minutes before she has to get up (Tr. p. 37).

Moses testified that she was recently examined by a neurosurgeon who told her she is a candidate for surgery (Tr. p. 37).

Moses testified that, during an average day, she tries to do a little housework, but she is not very productive (Tr. pp. 37-38).  Moses testified that when she tries to do housework, and starts moving and lifting, she starts hurting badly (Tr. p. 38).  Moses testified that someone does her grocery shopping for her, and she makes very simple meals, such as sandwiches or heating frozen foods, and her daughters help her (Tr. p. 38).  Moses testified

that she does not visit anyone, no one visits her, and she does not attend church or other social gatherings (Tr. p. 38). Moses testified that she has difficulty bathing because she has trouble lifting her leg over the side of the tub, so she does not bathe every day (Tr. pp. 43-44). Moses testified that she can reach, but she cannot bend (Tr. p. 44). Moses also testified that she is unable to wash her hair because she cannot bend over in the tub (she does not have a shower in her house) (Tr. p. 44). Moses testified that she aches when it is about to rain or when it gets cold (Tr. p. 44). Moses also testified that she cannot bend over to the floor (Tr. p. 45). Moses testified that her daughter does the laundry and takes it to Moses to fold (Tr. p. 45).

Moses testified that she used to be a secretary at a construction company (2000-2005, 2008-2009) (Tr. p. 39). In 2008-2009, Moses sat a desk, used a computer, made customer invoices, answered the phone, and ran errands, and the heaviest thing she lifted was a ream of paper (Tr. pp. 39-40). Moses testified that, in 2000-2005, she did payroll, bookkeeping, general office work, and ran errands (Tr. pp. 40-41).

Moses testified that she stopped driving in 2011 because she could not press on the accelerator when her back and leg hurt; when she tried and it hurt, she would have an anxiety attack (Tr. p. 41). Moses testified that she is scared to drive now (Tr. p. 41).

Moses testified that she goes to the mental health clinic once a month (although she missed her last appointment), and her medications help with both her depression and her anxiety (Tr. pp.

41-42).  Moses testified that she quit using crystal meth in 2006 and alcohol in 2010 (Tr. p. 24).

Moses testified that physical therapy did not help, but that she tries to do home exercises sometimes (Tr. p. 43).  Moses testified that she does not have any medication side effects (Tr. pp. 43, 44).  Moses testified that she takes Tramadol four times a day for pain, but it is not helping (Tr. p. 43).  Moses also has a knee brace and a cane (Tr. p. 45).

The vocational expert ("VE") testified that Moses' past work as a secretary was sedentary, SVP 6, DOT 201.362-030 (Tr. p. 47).[3]

The ALJ posed a hypothetical involving a person of Moses' age, education, and work experience, who can perform light work with occasional climbing or stairs and ramps, occasional stooping, kneeling, crouching and crawling, limited to unskilled work that has few (if any) changes in the work process, who cannot have any strict production quotas or time limits such as assembly work or piece work, cannot interact with the general public, can only occasionally interact with coworkers and supervisors, and the work should be done alone and not as part of a team or collaborative effort (Tr. pp. 47-48).  The VE testified that such a person could work as a sorter (light, SVP 2, DOT 769.687-042, 411,000 jobs in the U.S. and 6300 in Louisiana), cleaner and polisher (light, SVP 2, DOT 709.687-010, 394,000 jobs in the U.S. and 6600 jobs in Louisiana), or a flagger (light, SVP 2, DOT 372.667-022, 68,000

---

[3] No testimony was elicited as to whether Moses could still do her past relevant work as a secretary; the ALJ appears to have assumed that she can not.

12

jobs in the U.S. and 1100 jobs in Louisiana) (Tr. p. 48).

The ALJ posed a second hypothetical involving the a person with the same restrictions as in the first hypothetical, except that she is limited to sedentary work (Tr. p. 48). The VE testified that such a person could work as an addresser (sedentary, SVP 2, DOT 209.587-010, 101,000 jobs in the U.S. and 1400 jobs in Louisiana) or as a document preparer (sedentary, SVP 2, DOT 249.587-018, 2,800,000 jobs in the U.S. and 33,000 jobs in Louisiana) (Tr. p. 49).

The ALJ posed a third hypothetical involving the same person with the same limitations for sedentary work, except that she has to elevate her leg, but it would be below the level of the desk or work table (Tr. p. 49). The VE testified that such a person could still perform the sedentary jobs of addresser and flagger (Tr. p. 49).

The ALJ posed a fourth hypothetical involving the same person with the same limitations for sedentary work, except that she has to elevate her leg above table level (Tr. p. 49). The VE testified that such a person could *not* perform the sedentary jobs of addresser and flagger (Tr. p. 49).

The VE then testified that, for any of the jobs identified, the person must be able to work eight hours per day and five days per week, the employer would expect the employee to do a certain amount of work each day, and the person would be unemployable if she has difficulty working (is not on-task) for one-third of each day due to mental or physical conditions (Tr. pp. 49-50).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Moses (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Moses has not engaged in substantial gainful activity since June 20, 2011 (the alleged onset date) (Tr. p. 15), that she met the insured status requirements for DIB through December 31, 2012, that she has severe

impairments of depressive disorder, anxiety disorder, and degenerative changes to the lumbar spine with right-sided radiculopathy, and that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 15-16).   The ALJ also found that Moses is unable to perform her past relevant work (Tr. p. 20).

At Step No. 5 of the sequential process, the ALJ further found that Moses has the residual functional capacity to perform light work with occasional climbing of stairs and ramps, occasional stooping, kneeling, crouching and crawling, limited to unskilled work that has few (if any) changes to the work process, she cannot have any work quotas or time limits such as in assembly work or piece work, she cannot interact with the general public, she can only occasionally interact with coworkers and supervisors, and the work should be done alone and not as part of a team or collaborative effort (Tr. p. 17).   The ALJ found that the claimant is a younger individual with at least a high school education, and the transferability of work skills was immaterial (Tr. pp. 20-21). The ALJ concluded there are a significant number of jobs in the national economy which Moses can perform, such as sorter (light), cleaner/polisher (light), or flagger (light) and, therefore, Moses was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on August 24, 2012 (Tr. pp. 20-22).

## Scope of Review

In considering Social Security appeals such as the one that is

presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983).  The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law.

16

Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Law and Analysis

Issue 1 - Mental Restrictions

Moses contends the ALJ declined to adopt the mental restrictions assessed by Dr. Julia Wood,[4] and adopted a mental residual functional capacity which is not reflective of the assessment by Dr. Fay Thrasher, the source on whom she intended to rely.  Moses argues that no evidentiary choices support the ALJ's finding, and the mental RFC adopted by the ALJ is less restrictive than any mental assessment in the record.

The ALJ assigned Dr. Thrasher's opinion "some weight," stating that it was generally consistent with the record as a whole and supported the mental accommodations in the ALJ's findings as to Moses' mental residual functional capacity (Tr. p20).  The ALJ further stated that, although Dr. Thrasher assigned Moses a GAF score of 60 on August 27, 2011, the Central Louisiana Mental Health Center assigned Moses a GAF score of 70 a month later, indicating that Moses's mental impairments are not so severe as to preclude all work (Tr. p. 20).  The ALJ apparently meant that the GAF score

---

[4] Dr. Wood was a non-examining consultant for the state's Disability Determinations Services, who reviewed Moses' mental health records and gave an opinion as to her mental residual functional capacity.

of 60 did not represent a high point of mental functioning for Moses, since her GAF score was 70 a month later, and therefore Moses's overall mental functioning did not preclude all work.

Moses argues that the non-examining psychological consultant, Dr. Wood, found she has more limitations in her mental functioning than the ALJ concluded. However, the ALJ correctly gave more weight to Moses' treating physicians (at the Central Louisiana Mental health Center) and one-time examining consultant (Dr. Thrasher), than to the opinion of the state Disability Determination Services consultant (Dr. Wood) who did not examine Moses and whose opinion was based solely on a review of Moses' medical records. See <u>Bowman v. Heckler</u>, 706 F.2d 564, 568 (5th Cir. 1984), citing <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (5th Cir. 1981), and cases cited therein; <u>Warncke v. Harris</u>, 619 F.2d 412, 416 (5th Cir. 1980); <u>Strickland v. Harris</u>, 615 F.2d 1103, 1109-1110 (5th Cir. 1980); <u>Williams v. Finch</u>, 440 F.2d 613, 616-17 & n. 6 (5th Cir. 1971). Moreover, Dr. Woods' assessment was made on September 16, 2011 (Tr. p. 72), from a review of Dr. Thrasher's August 2011 evaluation of Moses. Moses began treatment and medication through the Mental Health Center in November 2011, and in March 2012 it was noted that Moses had been taking her medications and wanted to stay on them, her eating and sleeping were good, she no longer needed Trazadone for sleep, she was calm and cooperative, her thinking was linear and goal-directed, she was oriented, her mood was good, and she denied having any depressive symptoms (Tr. p. 303). Since Dr. Woods' September 2011 assessment

predated Moses' mental health treatment, it was outdated at the time of the ALJ's August 2012 decision.

Moses also contends the job of "flagger" is inconsistent with the ALJ's limitation of "no interaction with the general public." First, it is noted that Moses did not question the VE about the requirements of the flagger job or otherwise raise this issue at the administrative hearing. Moses is complaining about a perceived conflict between her inability to interact with the general public and her belief that the job of flagger requires interaction with the public.[5] Because Moses' counsel declined the opportunity to question the VE during the administrative hearing, Moses waived the right to raise this implied conflict on appeal. Pineda v. Astrue, 289 Fed.Appx. 710, 714 (5th Cir. 2008), citing Carey v. Apfel, 230 F.3d 131, 146-147 (5th Cir. 2000). In any event, even if the job of flagger is inconsistent with Moses' limitations, the VE identified two other jobs which Moses can perform, and Moses has not contended otherwise.

Moses further argues that, because she is "moderately limited in social functioning, moderately limited in ability to accept instructions and respond appropriately to criticism from supervisors, and moderately limited in ability to get along with coworkers without distracting them or exhibiting behavioral

---

[5] Pursuant to Social Security Ruling 85-16, "Residual Functional Capacity for Mental Impairments," interaction with the general public or with other people means having *close* contact with other people. A reduced capacity for close contact and interaction with other people means a claimant would not be able to do work requiring close contact and interaction with other people. SSR 85-16, *3.

extremes," she would not be able to function successfully in a work setting where she would have to interact with coworkers and supervisors one-third of the work day. Again, Moses is quoting the mental functional limitations assigned by the non-examining consulting psychologist, Dr. Wood (Tr. pp. 72-76), which were not adopted by the ALJ. Therefore, this argument is meritless. It is notable, however, that Dr. Wood found Moses could perform some work despite her limitations (Tr. p. 75).

Moses next argues that, although the ALJ did not adopt Dr. Wood's limitations, she also did not fully adopt the limitations assigned by Dr. Thrasher, although she stated that she assigned Dr. Thrasher's opinion "some weight." Specifically, Moses points out that Dr. Thrasher rated her adaptation as poor; actually, Dr. Thrasher stated that Moses' adaptation "appeared poor at that time," as well as stating her social interaction appeared impaired (Tr. p. 275). However, the ALJ also assigned some weight to Moses' treating health care professionals at the Mental Health Center, which reflected improved functioning, and found their opinion indicated that Moses' mental impairments are not so severe as to preclude all work (Tr. p. 20). Dr. Thrasher's evaluation also predated Moses' mental health treatment.

As noted above, Moses took her medication as prescribed by the Mental Health Center and went to her appointments and, by March 2012, her eating and sleeping were good, she reported that she did not need Trazadone for sleep at that time, she was calm and cooperative, her thinking was linear and goal-directed, she was

oriented, her mood was good, and she denied having any depressive symptoms.   The ALJ stated, "[t]he symptoms from her mental impairments are reasonably expected to cause some distraction and limit her ability to work with others.   However, if limited to a range of unskilled, low-stress light work, and work which allows her to work relatively independently, as further indicated in the above finding of residual functional capacity, she should otherwise be able to work without restriction."   (Tr. p. 20).

Therefore, the ALJ's findings reflect both the assessment by the consulting, examining psychologist (Dr. Thrasher) and the findings of the Mental Health Center as to Moses' improved condition following a few months of treatment, and incorporate Moses' need to work alone.   Substantial evidence supports the ALJ's findings as to Moses' mental residual functional capacity.

This ground for relief is meritless.

Issue 2 - VE's Testimony

Moses also contends that, when ALJ found that she cannot resume her past work, the burden to prove other jobs shifted to the Commissioner.   Moses argues that, since the assumptions which underpin the VE's testimony are unsupported, the Commissioner's burden to prove other jobs is unsatisfied.   Specifically, Moses argues that the ALJ failed to include all of her mental restrictions in the hypothetical to the VE, so the VE's testimony, that there are jobs which Moses can perform, is based on a defective hypothetical.

The Fifth Circuit has consistently held that, once the ALJ

determines that a claimant suffers from a nonexertional impairment that prevents him from performing his past relevant work, the Commissioner must produce expert vocational testimony or other similar evidence to establish that other jobs exist in the nation economy that the claimant can perform.   Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein.   The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.   A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specified job.   Fields, 805 F.2d at 1171.

Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, a determination of non-disability based on such a defective question cannot stand.   Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

Moses contends (as she did above) that the ALJ failed to incorporate all of the limitations assessed by Dr. Wood into her hypothetical.   However, as stated above, the ALJ did not adopt the

22

Dr. Wood's assessment.    Since the ALJ's findings as to Moses' mental residual functional capacity are supported by the evidence as a whole and those findings were incorporated in the hypothetical to the VE, the hypothetical was not defective and the VE's testimony constitutes substantial evidence that there is work which Moses can perform.

Therefore, substantial evidence supports the Commissioner's finding that Moses can do work which exists in significant numbers in the national and regional economies, and thus is not disabled.

This issue is meritless.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Moses' appeal be DENIED AND DISMISSED.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs (such as  supplemental objections, reply briefs etc.) may be filed.  Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.   Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT**

WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE
SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR,
FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL
FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 2nd
day of ~~April~~ May 2014.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

24